1  PAUL J. PASCUZZI, State Bar No. 148810
   JENNIFER E. NIEMANN, State Bar No. 142151
2  FELDERSTEIN FITZGERALD
   WILLOUGHBY & PASCUZZI LLP
3  400 Capitol Mall, Suite 1750
   Sacramento, CA  95814
4  Telephone: (916) 329-7400
   Facsimile: (916) 329-7435
5  ppascuzzi@ffwplaw.com
   jniemann@ffwplaw.com
6
   Attorneys for Grail Semiconductor
7

8                    UNITED STATES BANKRUPTCY COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                           SACRAMENTO DIVISION

11 | In re:                          | CASE NO.  15-29890
12 | GRAIL SEMICONDUCTOR, a          | DCN:  FWP-5
   | California corporation,         |
13 |                                 | Date:       February 10, 2016
   |                                 | Time:       10:00 a.m.
14 |      Debtor-in-Possession       | Courtroom:  34
   |                                 |             501 I Street, 6th Floor
15 |                                 |             Sacramento, CA

16           **EXHIBIT TO DEBTOR'S MOTION TO REJECT**
             **EMPLOYMENT AGREEMENT WITH RONALD W. HOFER**
17

18 | **Exhibit** | **Description**       |
   |-------------|-----------------------|
19 | A           | Employment Agreement  |

20

21  Dated: January 26, 2016

22                            FELDERSTEIN FITZGERALD
                              WILLOUGHBY & PASCUZZI LLP
23
                           By:*/s/ Paul J. Pascuzzi*_____
24                            PAUL J. PASCUZZI
                              Attorneys for Grail Semiconductor
25

26

27

28

                                                EXHIBIT TO DEBTOR'S MOTION TO
                                                REJECT EMPLOYMENT AGREEMENT
                        -1-                     WITH RONALD W. HOFER

# EXHIBIT A

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement" or the "Employment Agreement"), effective as of November 1, 2010 (the "Effective Date"), is entered into by and among Ronald W. Hofer Ronald W. Hofer ("Executive") and Grail Semiconductor, a California corporation (the "Company").

## 1. EMPLOYMENT AND TERM

**1.1 Officer Position; Fiduciary Duty; No Other Contract.** The Company shall employ and retain Executive as Chief Executive Officer, and Executive agrees to be so employed, subject to the terms and conditions set forth herein. Executive's duties and responsibilities shall be those assigned to him hereunder, from time to time, by the Board of Managers of the Company (the "Company Board"). Executive acknowledges, accepts and agrees that, as an officer of the Company, he holds a position of trust and confidence with the Company, that he is a fiduciary to the Company, and that he will faithfully satisfy, observe and comply with his fiduciary duties to the Company. Executive represents and warrants to the Company: (a) that Executive is not bound by any agreement, commitment or undertaking which is inconsistent or incompatible with this Employment Agreement; and, (b) that Executive's signing, execution and delivery of this Employment Agreement, as well as the performance, satisfaction and observation by Executive of Executive's obligations and covenants under or contemplated by this Employment Agreement and of the terms and conditions of this Employment Agreement do not, and will not, cause Executive to be in breach of or default under any other agreement, commitment or undertaking to which Executive is a party or is otherwise bound.

**1.2 Limitations.** During the Employment Term (as defined below), Executive shall devote his business time, attention and energies to the business of the Company and will not, without the prior written consent of the Board, be engaged in any other business activities. Executive shall not be prevented from (a) engaging in any civic or charitable activity for which Executive receives no compensation or other pecuniary advantage or (b) purchasing securities in any corporation whose securities are regularly traded, provided that such purchases will not result in Executive owning beneficially at any time 5% or more of the equity securities of any corporation engaged in a business competitive with that of the Company.

During the Employment Term, whether or not a notice of non-renewal has been given as provided for in Section 1.3, Executive shall not, without the prior written consent of the Board, seek, solicit or negotiate offers of employment for the Executive from any person or entity other than the Company; provided that, if a notice of non-renewal has been given by the Company as provided for in Section 1.3, during the last two months of the Employment Term, Executive may seek, solicit or negotiate other offers of employment for the Executive so long as such activities do not interfere with the performance of Executive's duties hereunder.

**Term.** Executive's employment under this Agreement shall commence on the Effective Date and shall terminate, unless earlier terminated in accordance with the terms hereof, as of the end of the end of the day on November 30, 2012; however, as of December 1, 2012 (and as of December 1st of each succeeding year), the term of such employment will be automatically extended for two additional years unless either: (a) the Company has given to Executive written notice of non-renewal, which notice must be given not later than the August 1st immediately prior to the date of such automatic extension; (b) Executive has given to Company written notice of non-renewal, which notice must be given not later than the August 1st immediately prior to the date of such automatic extension; or, (c) Executive's employment under this Agreement has otherwise been terminated in accordance with the terms of this Agreement. The period commencing as of the Effective Date and ending as of the end of the day November 30, 2012, or August

1

Employment Contract – Ronald W. Hofer

1st of any succeeding two year period through which this Agreement has been renewed, shall be referred to herein as the "Employment Term".

## 2. COMPENSATION AND BENEFITS

**2.1** **Base Compensation.** The Company, subject to Company receiving its first round of independent financing, shall pay Executive an annual salary, beginning at the end of the Transition Period, in an amount initially equal to $240,000, in equal installments in accordance with the Company's then regular payroll practices and policies and subject to applicable withholding and other applicable taxes and deductions ("Base Compensation"); provided, that during the Transition Period, the annual salary, and thus the Base Compensation, shall be $240,000 for the period December 1, 2010 to November 30, 2011 and further provided, that the Base Compensation for the period from the Effective Date through the date, when the Company receives its first round of independent financing (the "First Financing Date") shall accrue until the Company receives its first round of independent financing. Executive's Base Compensation shall be reviewed no less often than annually and may be increased by the Company as directed by the Board in its sole discretion; The term "Base Compensation" shall thereafter refer to such increased or reduced amount. For the avoidance of doubt, monies loaned or otherwise advanced by any member of the Company to pay any Accrued Obligations or other expenses of the Company are not, and shall not be construed as, "independent financing."

**2.2** **Long-Term Incentives.** In addition to the foregoing, Executive shall be entitled to receive five percent of gross proceeds of any and all litigation and license or other fees paid to the Company. Proceeds from litigation, shall be paid upon distribution of any settlement or verdict directly from the attorney trust account. Executive shall be entitled to additional compensation from time to time as determined by the Company. Executive shall be entitled to additional compensation upon meeting certain benchmarks determined by the Company or any Affiliate of the Company, to add value to the Company. Such benchmarks that will qualify Executive for additional bonus shall be, resolution of the Mishcon fee dispute, securing capital for continuing operations of the Company and funds for the development of the "552" technology. Other benefits will available to Executive as net profits of the Company are realized and result in increased shareholder value. Executive shall be eligible for stock options as determined by the Company based on increased shareholder value and shall be calculated on net profits. Any stack option that may be awarded shall vest over a three (3) year period.

**2.3** For purposes of this Section 2.2, net profits shall be defined as:

Gross revenue of company *minus* [cost of goods sold and services invoiced + royalties or license fees paid to Company + actual overheads, marketing and promotional expenses up to a maximum of 30% of gross revenue for that period].

Net profits so defined will not be reduced for reasons of capital or property depreciation, changes in method of accounting, or other extraordinary write-offs or devices.

**2.4** **Other Benefits.** During the Employment Term and in addition to the amounts otherwise provided herein, Executive shall be entitled to participate in such plans, policies and programs (collectively, "Benefits") as may be maintained, from time to time, by the Company for the benefit of the employees of the Company. Any such Benefits shall be determined in accordance with the specific terms and conditions of the documents evidencing any such plans, policies and programs. Executive acknowledges and agrees as follows: that, as of the Effective Date, the Company has no, and for the foreseeable future the Company is not likely to offer any, Benefits whatsoever; that the Company may never adopt or offer any such Benefits; that neither the Company nor its Affiliates have made any promises or other commitments whatsoever to the Executive to provide any such Benefits; and, that Executive has no right or interest to participate in or benefit from, and will never make any claim under or

seek any benefit under, any of the plans, policies, programs or other benefits of any of the Affiliates of the Company.

2.5   **Reimbursement of Expenses.**  The Company shall reimburse Executive for such reasonable and necessary expenses as are incurred in carrying out his duties hereunder as are approved, in advance, by either the Company Board of the Company from time to time and as permitted by law; provided, that Company's obligation to reimburse Executive hereunder shall be contingent upon the timely presentment by Executive of an itemized accounting of such expenditures.

### 3. TERMINATION

3.1   **Termination Payments to Executive.**  As set forth more fully herein, if, during the Employment Term, the Company shall terminate Executive's employment other than for Cause, Death, Disability or as a result of non-renewal of this Agreement (a "No Cause Early Termination"), the Company shall, if the First Financing Date is prior to the Date of Termination of the No Cause Early Termination, pay and/or provide to Executive, subject to Section 3.10, the following:

a. The following amounts to the extent accrued but not yet paid (collectively, the "Accrued Obligations"): (i) Executive's Base Compensation accrued but not yet paid as of the Date of Termination (as set forth in each separate provision of this Section 3), and (ii) reimbursable amounts owed under Section 2.5 above;

b. Executive's Base Compensation for the remainder of the Employment Term, payable in not more than two equal installments (one-half not later than one (1) month after the Date of Termination and the other one-half not later than two (2) months after the Date of Termination) but not later than the end of the Employment Term; and,

c. To the extent any Benefits have then been provided to the Executive, to continue, but only to the extent mandated by law, to provide such Benefits to the Executive,

all of forgoing subject to any rights of Company to withhold, set off or otherwise offset against any amounts for claims by the Company or as otherwise permitted by law.

Except as expressly provided above in this Section 3.1, Executive shall not be entitled to any other severance pay or compensation whatsoever for a No Cause Early Termination. For the avoidance of doubt, the foregoing, Executive's rights under this Section 3 shall be and are in lieu of any benefits that may otherwise be payable to or on behalf of Executive pursuant to the terms of any severance pay arrangement of the Company which it now has or may later have, or any other similar arrangement of the Company which it now has or may later have, providing benefits upon involuntary termination of employment. Executive shall be entitled to receive the payments and benefits provided in this section only once, regardless of the position from which he is removed.  Nothing contained herein shall prohibit the forfeiture or reduction of any compensation or benefit in accordance with the terms of any separate plan, policy or program maintained by the Company. Except either in the case where Executive's employment is terminated by Company for Cause or to the extent of any of the Company's claims or other rights against Executive for any breach of this Employment Agreement or Executives other duties, damages or injuries to the Company, any compensation and benefits actually paid to or received by Executive or his estate prior to the First Financing Date are nonrefundable.

In the event that any Accrued Obligations owing to Executive upon any Termination are not paid within the time periods stipulated in this agreement, interest shall accrue on such Obligations at a rate of 10% per month. In the event that such payments are not paid and that Executive must seek recovery through

Employment Contract – Ronald W. Hofer

3

litigation or arbitration and is found to be entitled to any such payments, Accrued Obligations will be trebled, all attorney fees and Executive will be entitled to seek any other relief available under law.

**3.2    Termination for Death.** If Executive dies during the Employment Term, Executive's employment hereunder shall immediately terminate and Company's obligations hereunder (other than the obligation to make payments and provide benefits as specified in this Section 3.2) shall automatically cease. In such event, Company, if the First Financing Date is prior to the Date of Termination under this Section 3.2, shall pay and provide to Executive (or his estate), subject to Section 3.10, the amounts described in Sections 3.1a and 3.1c hereof subject to any rights of Company to withhold, set off or otherwise offset against any amounts for claims by the Company or as otherwise permitted by law. The Date of Termination for purposes of this Section 3.2 shall be the date of Executive's death. For the avoidance of doubt, if the Date of Termination under this Section 3.2 is prior to the First Financing Date, neither Executive nor his estate shall be entitled to payment of any of the Accrued Obligations or any other compensation whatsoever or to the receipt of any benefits whatsoever.

**3.3    Company's Termination for Cause.** Executive's employment under this Agreement may be terminated by Company during the Employment Term on account of Cause. In such event, the obligations of Company hereunder (other than the obligation to make the payments specified in this Section 3.4 and payments provided by Sec. 2.2) shall automatically cease. In such event, Company, shall pay to Executive, subject to Section 3.10, the Accrued Obligations subject to any rights of Company to withhold, set off or otherwise offset against any amounts for claims by the Company or as otherwise permitted by law. Notwithstanding any provision of this Agreement or any other plan, policy or agreement evidencing any other compensation arrangement or benefit payable to Executive, no additional amount shall be paid to Executive, except as may be required by law.

For purposes of this Agreement, "Cause" means that Executive has:

a.  committed fraud, embezzlement or theft in the course of his employment or otherwise engaged in any intentional misconduct;

b.  committed intentional damage to the property of the Company, or any of its Affiliates or committed intentional, or grossly negligent, wrongful disclosure of Confidential Information (as defined in Section 5.2) whether or not it can be shown that it is materially injurious to the financial condition or business reputation of the Company, or any of its Affiliates;

c.  been convicted or entered a guilty or nolo contendre plea with respect to a crime within the meaning of this Section 3.4(a) or (b) or to a crime involving moral turpitude; or, been convicted or entered a guilty plea with respect to any felony;

d.  intentionally refused to perform the essential duties of his position (occasioned by reason other than physical or mental illness or disability of Executive) which deficiency has not been cured within 10 days after written notice of the breach by the Company Board to Executive specifying the nature of the breach;

e.  committed a material breach of his obligations under this Agreement (other than as a result of incapacity due to physical or mental illness or disability of Executive), which has not been cured within 10 days after written notice of the breach by the Company Board to Executive specifying the nature of the breach; or,

f.  committed any breach of his obligation under this Agreement (other than as a result of incapacity due to physical or mental illness or disability of Executive), which is committed either in bad faith, or without reasonable belief that the breach was in the best

4

Employment Contract – Ronald W. Hofer

interest of Company, or under circumstances where the Executive should have known that such breach was not in the best interest of the Company.

The Company Board shall provide written notice to Executive of such termination, which notice shall (i) indicate the specific termination provision in this Agreement relied upon and (ii) include a general description of the reasons for the determination of Cause.

In the event that any Accrued Obligations owing to Executive upon any Termination are not paid within the time periods stipulated, interest shall accrue on such Obligations at a rate of 10% per month. In the event that such payments are not paid and that Executive must seek recovery through litigation or arbitration and is found to be entitled to any such payments, Accrued Obligations will be trebled, attorney fees paid and Executive will be entitled to seek any other relief available under law.

Executive represents and warrants to the Company: (1) that all information which Executive has provided, or may hereafter provide, to Company about Executive's education, experience, published works and other credentials (including, without limitation, on any resume or curriculum vitae provided to Company is materially true, accurate and correct and that the Company and its Affiliates can rely on same; and, (2) that as of the Effective Date, and as of the date that Executive signs this Employment Agreement, there exists no "Cause" as defined above and there is no litigation, investigation or proceeding pending or threatened against Executive which, with the lapse of time, would result in such "Cause" or which, through further diligence, prosecution or proceedings by third parties or any government, is more likely than not to result in such "Cause."

      3.4    **Termination by Executive.** Executive may terminate his employment under this Agreement during the Employment Term, other than on account of Constructive Termination, upon ninety (90) days prior written notice to Company, addressed to the Company Board (in addition to giving notice in compliance with Section 5.7), or such shorter period as may be agreed upon in writing by the Company Board and Executive. The Date of Termination in such case (unless an earlier date is specified by the Company Board, which right to specify an earlier date the Company hereby has and Executive hereby grants to Company) shall be the date specified in the Section 5.7 notice or, if no such date is specified or the date specified is not at least ninety (90) days after the giving of the notice in accordance with Section 5.6, the date ninety (90) days after the giving of such notice to the Company Board and in accordance with Section 5.6. In such event, the obligations of Company hereunder (other than the obligation to make the payment specified in this Section 3.7) shall automatically cease. In such event, Company, if the First Financing Date is prior to the Date of Termination under this Section 3.7, shall pay to Executive, subject to Section 2.1 -2.2, the Accrued Obligations subject to any rights of Company to withhold, set off or otherwise offset against any amounts for claims by the Company or as otherwise permitted by law. No additional payments or benefits, beyond those provided in Section 2.2, shall be due hereunder, except as may be provided under a separate plan, policy or program evidencing such compensation arrangement or benefit in which Executive participated as of the Date of Termination or as may be required by law.

If the Date of Termination under this Section 2.7 is prior to the First Financing Date, Executive shall not be entitled to payment of any of the Accrued Obligations or any other compensation whatsoever or to the receipt of any benefits whatsoever

      3.5    **Expiration of Employment Term.** Upon the expiration of Executive's employment as a result of non-renewal in accordance with the provisions hereof, whether before or after the First Financing Date, Company shall pay Executive, upon the First Financing Date as provided by Section 2.3, the Accrued Obligations. No additional payments or benefits, beyond those provided by Section 2.2, shall be due hereunder except as may be provided under a separate plan, policy or program evidencing such compensation arrangement or benefit in which Executive participated as of the expiration of the Employment Term or as may be required by law.

5

Employment Contract – Ronald W. Hofer

3.6     **Return of Property.** Upon termination of employment under this Agreement for any reason whatsoever, Executive shall immediately return to Company all of the property of Company (and its Affiliates), including, without limitation, keys, automobiles, equipment, computers, fax machines, portable telephones, printers, software, credit cards, passes, manuals, handbooks, customer lists, financial data, files, letters, notes, notebooks, reports and copies (electronic or otherwise) of any of the above and any Confidential Information (as defined in Section 5.2 hereof) that is in the possession or under the control of Executive.

3.7     **Effect of Termination of Other Positions.** If, on the Date of Termination, Executive holds any other position with the Company or any of its Controlled Affiliates, Executive shall be deemed (without any further action being necessary) to have resigned from all such positions as of the Date of Termination. Notwithstanding the foregoing, Executive agrees to promptly execute and deliver such documents and take such other actions as Company may request to reflect such resignations consistent with the terms of this Section 3.

## 4. LIMITATIONS ON ACTIVITIES

4.1     **Consideration for Limitation on Activities; Survival.** Executive acknowledges, accepts and agrees for all purposes that the execution of this Agreement constitutes consideration for the limitations on activities set forth in this Agreement, the adequacy of which is hereby expressly acknowledged and accepted and agreed to by Executive. Executive further acknowledges, accepts and agrees that his obligations and covenants under this Agreement shall survive the termination, expiration, rescission, dissolution, cancellation or otherwise end of his employment under this Agreement as well as the termination, expiration, rescission, dissolution, cancellation or otherwise end of this Agreement and shall remain operative and in full force and effect for the periods described in this Agreement.

4.2     **Confidential Information.** Executive recognizes and acknowledges that during the term of his employment, he will have access to confidential, proprietary, sensitive or other non-public information or materials concerning the Company or its Affiliates, which may include, without limitation, (a) books and records relating to operations, finance, accounting, personnel and management, (b) Intellectual Property, (c) various other non-public trade or business information, including business opportunities, marketing or business diversification plans, methods and processes and financial data and the like (collectively, the "Confidential Information"). Executive agrees to, at all times, diligently safeguard and protect Confidential Information against unauthorized use or disclosure. Executive agrees that he will not at any time, either while employed by Company or thereafter, make any independent use of or disclose to any other person or organization (except as authorized by Company in writing or pursuant to court order) any of the Confidential Information. Executive agrees that, upon leaving the employ of, or any termination of employment with, the Company for any reason, he will not take with him any document or other materials belonging, or licensed, to Company or its Affiliates which is of a confidential, proprietary, sensitive or other non-public nature relating to Company or any of its Affiliates. Executive further represents and warrants to Company that Executive has not, and shall not, disclose or make available to Company, or use for the benefit of Company, any trade secrets or other confidential or proprietary information of a third party.

4.3     **Non-Solicitation.** Executive agrees that as of the Effective Date and continuing until two years after the Date of Termination, he shall not, directly or indirectly, for his own benefit or on behalf of another or to the detriment of the Company or any of its Affiliates:

    a.     Solicit any officer or employee to leave his/her employment with the Company or any of its Affiliates or participate in the hiring of, offer to hire or participate in the offer to hire of any officer or employee of the Company or any of its Affiliates;

Employment Contract – Ronald W. Hofer

b. Persuade or attempt to persuade any officer or employee of the Company or any of its Affiliates to discontinue his/her employment or other business relationship with the Company or any of its Affiliates; or

c. Solicit, divert or attempt to divert any customer, patron, licensee, licensor, supplier or vendor of the Company or any of its Controlled Affiliates.

Without limiting Company's rights, or Executive's obligations and covenants, under the forgoing, Executive agrees to refrain from soliciting customers of the Company or its Controlled Affiliates within the Restricted Territory (defined below) so long as Company or its Controlled Affiliates carry on a like business therein, not to exceed a period of two years from the Date of Termination.

Without limiting Company's rights, or Executive's obligations and covenants, under the forgoing, Executive agrees to refrain from soliciting customers of the Company within the Restricted Territory (defined below) so long as Company carries on a like business therein, not to exceed a period of two years from the Date of Termination.

The parties intend this Section 4.3 to be enforceable to the fullest extent permitted by applicable law as in effect from time to time.

The parties agree that each of the prohibitions in this Section 4.3 is intended to constitute a separate and independent restriction. Accordingly, should any such prohibition be declared invalid, illegal or unenforceable for any reason, such prohibition shall be deemed severable from and shall not affect the remainder thereof. To the extent not prohibited by law, in so severing, only the least amount of text as is necessary to avoid such prohibition being invalid, illegal and unenforceable shall be so severed. Further, to the extent that the court, arbitrator(s) or other tribunal of competent jurisdiction has the power to reform the provisions of this Section 4.3 to avoid having an invalid, illegal or unenforceable prohibition, the parties agree that said court, arbitrator(s) or other tribunal may, and do hereby request that they, exercise such power so as to conform such prohibition to a form which is as close to the original meaning as possible and yet still be valid, legal and enforceable.

**4.4 Noncompetition.** Executive agrees that, from the Effective Date and continuing until two years after the Date of Termination, he shall not carry on or engage in, or consult with, or support (or invest in or become a shareholder of (except for less than 1% of a publicly traded company) or be a member of, or serve as a director, manager, officer, employee or principal of or control or operate) any business to, or which is involved in efforts to, invent, develop, promote, sell, make, market, import, export, distribute or exploit any kind of semiconductor or other related technology that Company may have an interest at the time of Termination.

Without limiting Company's rights, or Executive's obligations and covenants, under the forgoing, Executive agrees to refrain to refrain from carrying on or engaging in a business similar to a pre-existing business of the Company

The parties intend this Section 4.4 to be enforceable to the fullest extent permitted by applicable law as in effect from time to time. Executive acknowledges, accepts and agrees for all purposes that the provisions of this Section 4.4 are reasonable as applied to him and are reasonable in both time and geographic scope and will not unduly restrict his ability to earn a living or to provide economic support to himself and his family.

The parties agree that each of the prohibitions in this Section 4.4 is intended to constitute a separate and independent restriction. Accordingly, should any such prohibition be declared invalid, illegal or unenforceable for any reason, such prohibition shall be deemed severable from and shall not affect the remainder thereof. To the extent not prohibited by law, in so severing, only the least amount of text as is necessary to avoid such prohibition being invalid, illegal and unenforceable shall be so severed. Further,

to the extent that the court, arbitrator(s) or other tribunal of competent jurisdiction has the power to reform the provisions of this Section 5.4 to avoid having an invalid, illegal or unenforceable prohibition, the parties agree that said court, arbitrator(s) or other tribunal may, and do hereby request that they, exercise such power so as to conform such prohibition to a form which is as close to the original meaning as possible and yet still be valid, legal and enforceable.

**4.5    Business Reputation.** Executive agrees that during the term of Executive's employment hereunder and at all times thereafter, he shall refrain from performing any act, engaging in any conduct or course of action or making or publishing any untrue or misleading statement which has or may reasonably have the effect of demeaning, tarnishing or disparaging the name, business reputation, invention or products of the Company or any of its Affiliates or which adversely affects (or may reasonably be expected to adversely affect) the best interests (economic or otherwise) of the Company or any of its Affiliates.

**4.6    Assistance with Litigation.** Executive agrees that during the term of his employment hereunder and thereafter for the period described herein, he will furnish such information and assistance as may be reasonably necessary in connection with any litigation or other proceedings in which the Company or any of its Affiliates is then or may become involved without requiring a court order or other compulsion and will use his best efforts to cooperate with the Company and its Affiliates in prosecuting or defending any such claim. In any case where Executive is required to travel for any consultation or legal proceedings at the express request of the Company or its Affiliates (excluding any instance where the Company or its Affiliates, on the one hand, and Executive, on the other hand, are on opposite sides of the litigation or are in any other opposing position or are in possible adverse positions), Executive shall be entitled to receive reimbursement of reasonable travel costs incurred. The provisions of this agreement shall apply following the term of Executive's employment hereunder to any timely raised matter in controversy that arose in whole or in part during, or related to any time period or event during, Executive's employment.

**4.7    Adverse Actions.** Executive agrees that following the Date of Termination of Executive's employment with Company for any reason, until the second anniversary of such Date of Termination, without the prior written consent of Company, Executive will not, to the fullest extent permitted by applicable law, in any manner, solicit or assist any other person or entity to undertake any action that would be reasonably likely to, or is intended to, either result in a change of control of Company or its Affiliates or seek to control in any material manner the Company Board or Board of any of Company's Affiliates.

**4.8    Remedies.** In the event of a breach or threatened breach by Executive of any of the provisions of the terms of this Employment Agreement, Executive agrees that Company shall be entitled to a temporary restraining order or a preliminary injunction (without the necessity of posting bond in connection therewith) to secure specific performance and to prevent a breach or contemplated breach of this Agreement and that, to the fullest extent permitted by law, Company shall be entitled to require the cancellation and forfeiture of any payments or benefits due to Executive or his successors, assigns, heirs, legatees or dependents hereunder. Nothing herein shall be construed as prohibiting Company from pursuing any other remedy available to it for such breach or threatened breach, including the recovery of damages. Executive confirms that Company and its Controlled Affiliates shall enjoy, and hereby grants to Company and its Controlled Affiliates, the rights and remedies arising under the laws of California. Executive must promptly notify Company of any actual or suspected breach by Executive of any provision of this agreement, or any other non-compete or restrictive covenants executed in other instruments in favor of Company or its Affiliates, of which Executive has, or should have, knowledge.

8

## 5. MISCELLANEOUS

     5.1    **Affiliate Definitions.** As used in this Employment Agreement, the term Affiliate, with respect to Company, means any of the following: Company's and any company which is controlled by the Company. It does not include any other person or entity.

     5.2    **Interpretation.** The parties acknowledge, accept and agree for all purposes that the parties are not of equal bargaining strength and Executive has negotiated the terms of this Employment Agreement without the benefit of counsel and that Executive has no familiarity with California employment law. Therefore, all provisions of this Employment Agreement shall be construed against the Company or interpreted to Company's disadvantage by any court or other governmental, judicial or arbitral authority by reason of Company having (or being deemed to have) drafted, crafted, devised, presented or imposed such provision. This Employment Agreement shall be liberally construed in favor of Executive. In this Employment Agreement, the parties have adopted a practice of using parenthetical expressions to clarify or otherwise express their agreement herein; and, all parenthetical expressions used herein are a part of this Employment Agreement and are to be enforced the same as any other forms of expression in this Employment Agreement.

     5.3    **Headings.** Section and other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

     5.4    **Entire Agreement.** This Agreement constitutes the entire understanding and agreement among the parties hereto with respect to the subject matter hereof, and there are no other agreements, understandings, restrictions, representations or warranties among the parties other than those set forth or referenced therein.

     5.5    **Amendments.** This Agreement may be amended or modified at any time in any or all respects, but only by an instrument in writing executed by the parties hereto.

     5.6    **Choice of Law.** The validity of this Agreement, the construction of its terms, and the determination of the rights and duties of the parties hereto shall be governed by and construed in accordance with the internal laws of the State of California applicable to contracts made, executed, delivered and to be wholly performed wholly within such state; provided that, with reference to this agreement, if the prohibitions against the Executive under any Sections of this agreement are to be enforced, wholly or partially, with respect to activities, events or actions in a jurisdiction other than California, Company shall have the right, with respect to each prohibition, to select the laws of either California or such other jurisdiction to apply to the interpretation and enforcement of such prohibition.

     5.7    **Notices.** All notices and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand, (b) sent by facsimile to a facsimile number given below, provided that a copy is also sent by a recognized overnight delivery service, (c) when received by the addressee, if sent by a recognized overnight delivery service or (d) three days after being mailed by U.S. mail, postage prepaid, in each case as follows:

If to Executive:   Ronald W. Hofer

_____
_____
_____
_____

If to Company:     Grail Semiconductor
                   c/o Don Stern

_____
_____

Email: don.stern.com

or to such other addresses as a party may designate by notice to the other party.

**5.8  Assignment.** This Agreement will inure to the benefit of and be binding upon Company, its successors and assigns, including, without limitation, any person, partnership, company, corporation or other entity that may acquire substantially all of Company's assets or business or with or into which Company may be liquidated, consolidated, merged or otherwise combined. This Agreement is personal to Executive and without the written consent of Company, shall not be assignable by Executive, other than Executive's rights to compensation and benefits, which may only be assigned by will or the laws of descent and distribution. This Agreement will inure to the benefit of and be binding upon Executive, his heirs, estate, legatees and legal representatives.

**5.9  Severability.** Subject to the special severability provisions in this agreement, each provision of this Agreement is intended to be severable. Subject to the special severability provisions in this agreement, in the event that any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable, the same shall not affect the validity or enforceability of any other provision of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable provisions was not contained herein.

**5.10  Withholding.** Notwithstanding any term or provision of this Employment Agreement, Company, as an additional right and remedy under this Employment Agreement, may withhold from any payment hereunder any federal, state or local taxes that Company reasonably believes are required to be withheld.

**5.11  Waiver.** The failure of either party to insist in any one or more instances upon performance of any terms, covenants or conditions of this Agreement will not be construed as a waiver of future performance of any such term, covenant, or condition and the obligations of either party with respect to such term, covenant or condition will continue in full force and effect.

**5.12  Specific Performance.** It is the intent and expectation of each of the parties hereto that each provision of this Employment Agreement will be honored, carried out and enforced as written. Consequently, each of the parties agrees that any provision of this Employment Agreement sought to be enforced in any proceeding may, at the election of the party seeking enforcement and notwithstanding the availability of an adequate remedy at law, be enforced by specific performance or any other equitable remedy.

**5.13  Dispute Resolution.** Any claim, dispute or controversy arising out of, related to, or in connection with, directly or indirectly, this Employment Agreement or the performance, enforcement, breach, termination, validity or interpretation of this Employment Agreement (including, without limitation, interpretation, settlement and resolution of the scope of these arbitration provisions), shall be

10



resolved and settled by final and binding arbitration in accordance with then existing Commercial Rules of the American Arbitration Association or any such successor rules (the "AAA Commercial Rules"). Only the AAA Commercial Rules, and not the federal or state law of any jurisdiction in which the arbitration is pending, shall govern discovery matters. The arbitration shall be conducted in New Orleans, California. While the existence of the arbitration proceeding is not required to be kept confidential, the arbitration proceedings, and any materials or information exchanged between the parties, or otherwise produced, for or during the arbitration proceedings, shall be kept and maintained private and strictly confidential; provided, that, for the avoidance of doubt, the forgoing neither enhances nor restricts the right of any party to discovery or to resist discovery. Judgment by the arbitration panel (whether one or three) may be entered by any court having jurisdiction thereof. The arbitrator(s) shall have the authority to require specific performance or impose other equitable relief hereunder, as well as imposing money damages, but Company shall be responsible for attorneys' fees of both Company and Executive. Notwithstanding the forgoing, either party shall have the right at any time, whether during the pendency of the arbitration or otherwise, to seek any injunctive or other equitable relief in either the United States District Court for the Northern California, State of California, to maintain the status quo pending, and during the pendency of, the arbitration or to protect the patents, trade secrets, copyrights, trademarks, trade dress, image, designs or other proprietary or Intellectual Property or Intellectual Property Rights of either party pending, or during the pendency of, the arbitration.

       5.14    **Survival.** Notwithstanding any other terms or conditions of this Employment Agreement, the following provisions survive any termination, expiration, rescission, dissolution, cancellation or otherwise end to this Employment Agreement: Section 6 as well as any definitions defined in this Employment Agreement.

       5.15    **Source of Payments.** Company shall not be required to establish a special or separate fund or other segregation of assets to assure any payments hereunder. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind.

       5.16    **No Duplication of Payment.** The obligation of the Company to make any payment or provide any benefit to the Executive hereunder shall be deemed satisfied to the extent that such payment is made or such benefit is provided by any of Company's Affiliates, and no payment or benefit shall be required to be paid or provided more than once.

       **THIS AGREEMENT** is executed in multiple counterparts as of the dates set forth below, each of which shall be deemed an original, to be effective as of the Effective Date.

**Grail Semiconductor**

By: _/s/ Don Stern_  
Don Stern  
Chairman of the Board

Date: November 1, 2010

**EXECUTIVE**

_____  
Ronald W. Hofer  
Chief Executive Officer

Date: November 1, 2010

resolved and settled by final and binding arbitration in accordance with then existing Commercial Rules of the American Arbitration Association or any such successor rules (the "AAA Commercial Rules"). Only the AAA Commercial Rules, and not the federal or state law of any jurisdiction in which the arbitration is pending, shall govern discovery matters. The arbitration shall be conducted in New Orleans, California. While the existence of the arbitration proceeding is not required to be kept confidential, the arbitration proceedings, and any materials or information exchanged between the parties, or otherwise produced, for or during the arbitration proceedings, shall be kept and maintained private and strictly confidential; provided, that, for the avoidance of doubt, the forgoing neither enhances nor restricts the right of any party to discovery or to resist discovery. Judgment by the arbitration panel (whether one or three) may be entered by any court having jurisdiction thereof. The arbitrator(s) shall have the authority to require specific performance or impose other equitable relief hereunder, as well as imposing money damages, but Company shall be responsible for attorneys' fees of both Company and Executive. Notwithstanding the forgoing, either party shall have the right at any time, whether during the pendency of the arbitration or otherwise, to seek any injunctive or other equitable relief in either the United States District Court for the Northern California, State of California, to maintain the status quo pending, and during the pendency of, the arbitration or to protect the patents, trade secrets, copyrights, trademarks, trade dress, image, designs or other proprietary or Intellectual Property or Intellectual Property Rights of either party pending, or during the pendency of, the arbitration.

**5.14  Survival.**  Notwithstanding any other terms or conditions of this Employment Agreement, the following provisions survive any termination, expiration, rescission, dissolution, cancellation or otherwise end to this Employment Agreement: Section 6 as well as any definitions defined in this Employment Agreement.

**5.15  Source of Payments.**  Company shall not be required to establish a special or separate fund or other segregation of assets to assure any payments hereunder. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind.

**5.16  No Duplication of Payment.**  The obligation of the Company to make any payment or provide any benefit to the Executive hereunder shall be deemed satisfied to the extent that such payment is made or such benefit is provided by any of Company's Affiliates, and no payment or benefit shall be required to be paid or provided more than once.

THIS AGREEMENT is executed in multiple counterparts as of the dates set forth below, each of which shall be deemed an original, to be effective as of the Effective Date.

**Grail Semiconductor**

By: _____
    Don Stern
    Chairman of the Board

Date: November 1, 2010

**EXECUTIVE**

_____
Ronald W. Hofer
Chief Executive Officer

Date: November 1, 2010